**IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION**

**ANGELA L. DOUGLAS,**

      **Plaintiff,**

**vs.**                              **Case No. 4:12cv332-WS/CAS**

**CAROLYN W. COLVIN,
Acting Commissioner of Social Security,**

      **Defendant.**

_____/

## REPORT AND RECOMMENDATION

This is a social security case referred to the undersigned United States Magistrate Judge for a report and recommendation pursuant to 28 U.S.C. § 636(b) and N.D. Loc. R. 72.2(D). Because no reversible error has been shown, it is recommended that the decision of the Commissioner be affirmed.

Plaintiff listed Michael J. Astrue, as the Defendant, named in his official capacity as Commissioner of Social Security. On February 14, 2013, Carolyn W. Colvin was appointed Acting Commissioner of Social Security. Carolyn Colvin should be automatically substituted as Defendant pursuant to Fed. R. Civ. P. 25(d).

**I. Procedural status of the case**[1]

Plaintiff, Angela Douglas, filed an application for Disability Insurance Benefits (DIB) and Supplemental Security Income (SSI) in December 2008. Tr. 162-69. Plaintiff alleged an onset date of September 1, 2005. Tr. 162, 166. The state agency denied her applications initially, Tr. 97-104, and on reconsideration. Tr. 105-07, 110-12. After a hearing was held on December 15, 2010, the Administrative Law Judge (ALJ) concluded that Plaintiff did not meet the statutory definition of disability during the relevant period of time and denied Plaintiff's applications. Tr. 26-42. Plaintiff sought review of the ALJ's unfavorable decision issued on February 7, 2011, but the Appeals Council denied Plaintiff's request for review on May 4, 2012, Tr. 1-7, 266-67; *see also* doc. 5 at 3. Thus, the ALJ's decision is the "final decision" of the Commissioner subject to judicial review. 42 U.S.C. § 405(g).

Plaintiff timely filed her complaint seeking judicial review of the ALJ's decision, asserting that the ALJ was prejudiced against her physicians who provide "free or low cost Healthcare." Doc. 5. Plaintiff further contends that in response to a hypothetical question from her attorney, the Vocational Expert testified that Plaintiff could not maintain employment and the ALJ agreed with that opinion. *Id.* Plaintiff also contends that the ALJ ignored the opinions of Plaintiff's physicians in denying her benefits. *Id.* Defendant maintains that the Commissioner's findings of fact are supported by substantial evidence and the decision should be affirmed. Doc. 11.

---

[1] Citations to the record (Tr.) will be to the page numbers printed on the paper record and not the page numbers assigned by the electronic docket as the pro se Plaintiff does not have access to the electronic docket.

## II. Findings of the ALJ

The ALJ made several findings relative to the issues Plaintiff raised in this appeal:

1.  "The claimant meets the insured status requirements of the Social Security Act through September 30, 2006." Tr. 13.

2.  "The claimant has not engaged in substantial gainful activity[2] since September 1, 2005, the alleged onset date . . . ." *Id.*

3.  "The claimant has the following severe impairments: major depression with psychotic features, grade II-III chrondromalacia of the right knee with chronic knee pain, chronic low back pain, status-post remote injury, and tendinopathy of the left rotator cuff . . . ." Tr. 14.

4.  "The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 . . . ." *Id.*

5.  "[T]he undersigned finds that the claimant has the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a) and 416.967(a). In addition, she can perform simple, routine, repetitive tasks. She cannot perform production rate or pace work. She also should have no interaction with the public. Furthermore, while she can work around co-workers throughout the day, she should have only occasional interaction with co-workers, with no tandem tasks. Finally, she must be allowed to sit and/or stand at will." Tr. 16.

6.  "The Claimant has no past relevant work . . . ." Tr. 21.

7.  "The Claimant was born on August 12, 1967, and was 38 years old, which is defined as a younger individual age 18-44, on the alleged disability onset date . . . ." Tr. 22.

8.  "The claimant has at least a high school education and is able to communicate in English . . . ." *Id.*

---

[2] The ALJ noted that Plaintiff had engaged in work activity in 2006 through 2009, but such "activity did not rise to the level of substantial gainful activity." Tr. 13. Moreover, her earnings "fell below the threshold for substantial gainful activity." *Id.*

9.    "Transferability of job skills is not an issue because the claimant does not have past relevant work . . . ."  *Id.*

10.   "Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform . . . ."  *Id.*

11.   The claimant has not been under a disability, as defined in the Social Security Act, from September 1, 2005, through the date of this decision . . . ."  Tr. 23.

The ALJ determined that Plaintiff was not disabled under the relevant provisions of the Social Security Act and her applications for disability insurance benefits and supplemental security income were denied.  Tr. 24.

## III.  Legal Standard Guiding Judicial Review

This Court must determine whether the Commissioner's decision is supported by substantial evidence in the record and premised upon correct legal principles.  42 U.S.C. § 405(g); Chester v. Bowen, 792 F.2d 129, 131 (11th Cir. 1986).  "Substantial evidence is more than a scintilla, but less than a preponderance.  It is such relevant evidence as a reasonable person would accept as adequate to support a conclusion." Bloodsworth v. Heckler, 703 F.2d 1233, 1239 (11th Cir. 1983) (citations omitted); Moore v. Barnhart, 405 F.3d 1208, 1211 (11th Cir. 2005).  "The Commissioner's factual findings are conclusive if supported by substantial evidence."  Wilson v. Barnhart, 284 F.3d 1219, 1221 (11th Cir. 2002).  When the Commissioner's decision is supported by substantial evidence, the reviewing court must affirm, even if the reviewer would have reached a contrary result as finder of fact, and even if the reviewer finds that the evidence preponderates against the Commissioner's decision.  42 U.S.C. § 405(g); Phillips v. Barnhart, 357 F.3d 1232, 1240 n.8 (11th Cir. 2004) (noting that "[i]f the

Commissioner's decision is supported by substantial evidence, we must affirm, even if the proof preponderates against it.") (citations omitted).  The Court must view the evidence as a whole, taking into account evidence favorable as well as unfavorable to the decision.  Lowery v. Sullivan, 979 F.2d 835, 837 (11th Cir. 1992); Tieniber v. Heckler, 720 F.2d 1251, 1253 (11th Cir. 1983).  "Unless the Secretary has analyzed all evidence and has sufficiently explained the weight he has given to obviously probative exhibits, to say that his decision is supported by substantial evidence approaches an abdication of the court's 'duty to scrutinize the record as a whole to determine whether the conclusions reached are rational.' "  Cowart v. Schweiker, 662 F.2d 731, 735 (11th Cir. 1981) (citations omitted).

A disability is defined as a physical or mental impairment of such severity that the claimant is not only unable to do past relevant work, "but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . ."  42 U.S.C. § 423(d)(2)(A).  A disability is an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months . . . ."  42 U.S.C. § 423(d)(1)(A).  Both the "impairment" and the "inability" must be expected to last not less than 12 months.  Barnhart v. Walton, 535 U.S. 212, 122 S.Ct. 1265, 1272, 152 L.Ed.2d 330 (2002).  "For SSI claims, a claimant becomes eligible in the first month where she is both disabled and has an SSI application on file." 20 C.F.R. § 416.202–03; Moore, 405 F.3d at 1211.  "For DIB claims, a claimant is

eligible for benefits where she demonstrates disability on or before the last date for which she were insured." 42 U.S.C. § 423(a)(1)(A); <u>Moore</u>, 405 F.3d at 1211. Because Plaintiff's last insured date was September 30, 2006, *see* Tr. 11, her DIB appeal requires a showing of disability on or before that date. 405 F.3d at 1211.

The Commissioner analyzes a claim in five steps. 20 C.F.R. § 404.1520(a)-(f), § 416.920(a)-(b):

1.    Is the Plaintiff engaging in substantial gainful activity?

2.    Does Plaintiff have any severe impairments?

3.    Does Plaintiff have any severe impairments that meet or equal those listed in Part 404, Subpart P, Appendix 1 of 20 C.F.R. 404?

4.    Does Plaintiff have the residual functional capacity to perform past relevant work?

5.    Does Plaintiff's impairments prevent any other work?

A positive finding at step one or a negative finding at step two results in disapproval of the application for benefits. A positive finding at step three results in approval of the application for benefits. At step four, Plaintiff bears the burden of establishing a severe impairment that precludes the performance of past relevant work. If Plaintiff has the residual capacity to do past relevant work, Plaintiff is not disabled. If Plaintiff either has no past relevant work or demonstrates an inability to do past relevant work, the burden shifts to the Commissioner at step five to establish that despite the impairments, Plaintiff is able to perform other work in the national economy in light of Plaintiff's residual functional capacity, age, education, and work experience. <u>Chester</u>, 792 F.2d at 131; <u>MacGregor v. Bowen</u>, 786 F.2d 1050, 1052 (11th Cir. 1986). If the Commissioner

carries this burden, Plaintiff must prove that he or she cannot perform the work suggested by the Commissioner.  Hale v. Bowen, 831 F.2d 1007, 1011 (11th Cir. 1987).

## IV.  Medical Evidence

Plaintiff alleged disability beginning on September 1, 2005, but did not provide any treatment records prior to February 2008.[3]  Tr. 17.  On February 24, 2008, Plaintiff was seen by Carla M. Holloman, D.O. for a consultative examination.  Tr. 269-74. Plaintiff was "alert, oriented, and in no acute distress."  Tr. 270.  She walked with normal gait without any assistive devices, had free range of motion in all four extremities, and arose from a seated position without difficulty.  Tr. 270-71.  Plaintiff had good grip and muscle strength, was able to do tandem walking, and maintained good alignment in her spine and legs, although she had positive straight leg raising on the left and tenderness in her low back.  Tr. 271-74.

On August 21, 2008, Plaintiff reported to the Gadsden County Urgent Care complaining of a toothache and right hip pain.  Tr. 278-79.  Plaintiff reported no psychological problems with anxiety, depression, or hearing voices.  Tr. 279.  Plaintiff had a normal gait and station, normal muscle tone and strength, and reported no back pain.  Id.  Plaintiff was given a prescription for Lortab.  Tr. 278.

One month later, on September 22, 2008, Plaintiff returned with complaints of a toothache and low back pain.  Tr. 276.  Plaintiff was given Flexeril[4] and Lortab.  Tr. 277.

---

[3] As Plaintiff's last insured date was September 30, 2006, Tr. 11, her DIB appeal required a showing of disability on or before that date.  That showing was not made.  Tr. 17.

[4] Flexeril is a muscle relaxant "used together with rest and physical therapy to treat skeletal muscle conditions such as pain or injury."  Lortab contains a combination of

Plaintiff again had no problems with anxiety, depression, or hearing voices, and had normal muscle tone, strength, and normal gait. Tr. 276.

Two months later, on November 19, 2008, Plaintiff was examined by Dr. Edwardo Williams at the Bond Community Health Center. Tr. 310. Plaintiff complained of a "history of back pain for many, many years with associated left shoulder pain for many years." *Id.* She complained of intermittent numbness and tingling in her left leg. *Id.* Plaintiff had less than full range of motion in her back and left shoulder and was unable to lift her arm over her head. *Id.* Testing revealed "possible rotator cuff injury and tenosynovitis of the shoulder muscle groups." *Id.* Plaintiff was given medications and directed to follow up in a month. *Id.*

On December 16, 2008, Plaintiff went to the Gadsden County Urgent Care complaining of low back pain. Tr. 281. She was given Flexoril and Lortab and directed to followup at the Bond Clinic. Tr. 280-81.

Plaintiff returned on December 29, 2008, for the followup with Dr. Williams and stated there was no improvement. Tr. 309. Plaintiff reported she was unable to perform many activities of daily living and said the pain was totally incapacitating. *Id.* Dr. Williams noted Plaintiff reported "some history of symptoms consistent with impending mild depression, which is getting worse with decreased mood, decreased affect, and crying spells." *Id.* Dr. Williams found Plaintiff's back and shoulder had "continued decreased range of motion." *Id.* Plaintiff's medications were continued and increased,

---

acetaminophen and hydrocodone, prescribed for moderate to severe pain.
www.drugs.com

she was referred to We Care for a possible MRI, she was to sign a controlled substance

agreement, and have a follow up appointment in one month.[5]  *Id.*

On February 19, 2009, Lawrence V. Annis, Ph.D., examined Plaintiff for a

consultative psychological evaluation.  Tr. 283-85.  Plaintiff said she could not work

because of her back and hip problems, and she said she has been depressed for years.

Tr. 283.  Plaintiff said she does not get along with anyone and said: "I just like to be by

myself."  *Id.*  Plaintiff avoided eye contact and frequently rubbed her hands together, but

did not squirm, fidget, or re-adjust her seated position as if uncomfortable.  Tr. 284.

Plaintiff appeared "depressed and anxious" and described her own mood as: "Sad.

Angry all he time."  *Id.*  Plaintiff was "repeatedly tearful" in the interview, saying she was

"just not happy."  *Id.*  Yet she denied ever attempting suicide or intentionally hurting

herself, although she admitted she has sometimes thought about it.  *Id.*  Plaintiff was

oriented and attentive and was not "distracted by events outside the room, her thoughts,

or unseen stimuli."  *Id.*  She reported having difficulty remembering "directions,

appointments, numbers, and lists of things" and said it was "often difficult to put names

to faces unless she knows someone well."  *Id.*  Dr. Annis stated: "Many of her reports

today of names, contents of events, and dates are vague, inconsistent, 'I don't know,'

and 'I don't remember,' even for important things that most people precisely describe."

Tr. 284-285.  Dr. Annis diagnosed Plaintiff with recurrent,  major depressive disorder

and believed that outpatient mental health treatment might "help, but some degree of

depression and anxiety [was] likely to continue."  Tr. 285.

---

[5] Plaintiff did not return for the follow up and clinic notes reflect she was a "no show."
Tr. 312.  Plaintiff returned approximately five months later on May 18, 2009.  Tr. 308.

Functionally, Dr. Annis opined that, to a limited degree, Plaintiff could "interact appropriately with people she does not know."  Tr. 285.  Dr. Annis believed that Plaintiff's "current depression and anxiety would be expected to reduce her ability to participate in social interactions requiring patience in difficult situations."  *Id.*  Further, Plaintiff may have difficulty with careful attention and protracted concentration when suffering physical pain.  *Id.*  According to Dr. Annis, Plaintiff's depression and anxiety would impede her occupational achievement and "she would require more encouragement than most people when encountering work difficulties or social challenges."  *Id.*  Plaintiff would also perform poorly in occupations that required frequent, protracted, or demanding social interaction.  *Id.*  Dr. Annis also believed that Plaintiff should "avoid employment at occupations requiring driving or contact with dangerous substances."  *Id.*

The following month, on March 24, 2009, James Mendelson, Ph.D., a state agency psychologist, completed a Psychiatric Review Technique form (PRT). Tr. 286-299.  Dr. Mendelson concluded that Plaintiff's medical impairments were "not severe" and that "coexisting nonmental impairments" required referral to another medical specialty.  Tr. 286.  Plaintiff was found to have only mild restriction in her activities of daily living, maintaining social functioning, and in maintaining concentration, persistence, or pace, and resulted in no episodes of decompensation.  Tr. 296.  The consultant's notes at the end of the PRT includes a notation that Plaintiff asserts "she is disabled because of medical issues primarily, although she does include a complaint of depression.  However there is no evidence that she has ever lost employment because

of depression or any other mental disorder." Tr. 298. Further, "the most applicable psychiatric diagnosis fails to exceed the severity level of an Adjustment [Disorder] with Mixed Emotional Features characterized by a somatic focus and dysphoric/anxious feelings." *Id.*

A Case Analysis dated March 27, 2009, signed by Monekka L. Monroe, found Plaintiff had free range of motion in all four extremities, with grip and muscle strength at 5/5, with no joint swelling, tenderness, or increased calor. Tr. 300. Plaintiff's "spine and extremities are in good alignment" and impairments were "not severe at this time." *Id.*

On May 18, 2009, Plaintiff returned to Dr. Williams for prescription refills, and "for followup of chronic back pain, chronic shoulder pain, and depression." Tr. 308, 311. In addition to noting that she had "been again denied by disability," Plaintiff said her pain was "getting little worse from time to time." Tr. 308. Plaintiff had increasing depression, malaise, and fatigue, and decreased mood, affect, and reported crying spells. *Id.* Plaintiff said she was experiencing "some dizziness" which occurs "usually when she moves or gets up," but lasts just "for a minute or so." *Id.* Dr. Williams encouraged Plaintiff to lose weight, modify her diet, and exercise for "30 minutes three to four times per week." *Id.*

Plaintiff returned to Dr. Williams on July 13, 2009, for prescription refills and reported she was "doing about the same." Tr. 306, 311. Dr. Williams noted that her depression was stable. Tr. 306. Plaintiff followed up with Dr. Williams again on September 21, 2009, for prescription refills and reported no new problems. Tr. 307. The notes for that visit again reflect that Bond Community Health Center would "try

referral to We Care for MRI of LS spine because of increasing intensity and severity of her back pain." Tr. 307. Plaintiff was able to have an MRI on December 3, 2009, which was "unremarkable" aside from "a broad base disc bulge [at L5-S1] without significant spinal stenosis or foraminal narrowing." Tr. 367. The impression was mild disc degeneration at L5-S1, otherwise unremarkable. *Id.*

On November 23, 2009, Richard K. Lyon, Ph.D., another state agency psychologist, also completed a PRT. Tr. 320-33. Dr. Lyon also found Plaintiff did not have a severe impairment. Tr. 320, 330. As was the case with Dr. Mendelson's evaluation, Dr. Lyon found that Plaintiff had only mild restriction in her activities of daily living, maintaining social functioning, and in maintaining concentration, persistence, or pace, and no episodes of decompensation. Tr. 330. The consultant's notes at the end of the PRT include a notation that Plaintiff was anxious and had depressed mood, but had "adequate attention concentration though these may be occasionally compromised if experiencing pain." Tr. 332. Dr. Lyon concluded that "there is no mental MDI which meets or exceeds listing levels." *Id.*

On January 11, 2010, Plaintiff returned to the Bond Community Health Center and was seen for the first time by Tiffany Welch, PAC, a physician's assistant. Tr. 350. Plaintiff wanted a refill of her prescriptions for Lortab and Ambien.[6] *Id.* Because Plaintiff's self-described sleep pattern revealed she "is able to get at least six hours of sleep on her own," Ms. Welch encouraged her "to become more physically active and try to push back falling asleep until 10 o'clock p.m. to see if this helps her stay [a]sleep

---

[6] Plaintiff had been on Ambien for three months, and admitted it was "not working as well for [Plaintiff] as it once did." Tr. 350.

until the morning." Tr. 350. Plaintiff mentioned that she had experienced some chest

pain, although she could not say "how long the pain lasts." *Id.* Ms. Welch performed an

EKG which "was within normal limits." *Id.* Although the notes reflect Plaintiff was "alert

and oriented, communicate[d] appropriately," Ms. Welch noted that she would like

Plaintiff "to be evaluated by mental health provider." *Id.* Plaintiff's prescriptions were

refilled and Plaintiff was to return in three months. *Id.*

Plaintiff returned to Ms. Welch on April 27, 2010, for her follow up appointment

and "well-woman exam." Tr. 353-354. Plaintiff was depressed and tearful, and

complained of back pain, and pain in right hip and right knee. Tr. 354. Plaintiff had right

knee crepitus and tenderness, but no swelling. *Id.* Her neurological and

musculoskeletal systems were normal. *Id.* Plaintiff was to continue on her current

medications. *Id.*

A notation in the Progress Notes indicates that Plaintiff called the Bond

Community Health Center on May 5, 2010, and said she needed a refill of hydrocodone.

Tr. 353. Plaintiff said she sometimes takes two because of her pain. *Id.* Plaintiff was

advised that hydrocodone should be taken as ordered, but Plaintiff "continued yelling

about 'We don't care, nobody cares about her pain, and she will be contacting her

lawyer,' and hung [up] the phone." *Id.* Similarly, another nurse spoke with Plaintiff on

the telephone on May 14, 2010, and Plaintiff advised that she was out of Lortab and had

no refills remaining. Tr. 352. Plaintiff was again "educated on the proper dosing and

the importance of taking the drug as ordered." *Id.* Plaintiff was advised "not to exceed

the prescribed dose (including taking more than one tablet/dose)." *Id.* Plaintiff again

was speaking loudly, but did not use profane language. *Id.* Plaintiff was advised to keep her upcoming appointment with Ms. Dillon and told that Dr. Robinson would "take over her care." Tr. 352. Plaintiff "returned to a calm demenor [sic]." *Id.* Five minutes later, nurse McCloud called Plaintiff back "to advise her that a new medication contract ha[d] been created for her. Advised patient that she can sign the new contract when she comes for her" appointment with Ms. Dillon on May 24, 2010. *Id.*

On May 24, 2010, Plaintiff underwent a psychiatric evaluation by Donna Dillon, ARNP, a nurse practitioner at Bond Community Health Center, based on the referral from Ms. Welch for Plaintiff's depression. Tr. 343-46. Plaintiff said she is depressed, has insomnia, and feels like people are "out to hurt her all [the] time." Tr. 343. Plaintiff said she is easily irritated, has trouble remembering, being able to focus or concentrate, and cries easily. *Id.* She complained that her back, knees, hip, and shoulder "hurt all the time." *Id.* Ms. Dillon noted that Plaintiff had a casual appearance, was cooperative, regular speech, but had fair-to-poor eye contact. Tr. 345. Her mood was noted to be depressed, anxious, irritable, and tired. *Id.* Her affect was congruent, and she had a linear, logical, and goal-directed thought process. *Id.* However, Plaintiff also expressed paranoid delusions and said she has auditory and visual hallucinations of her sister and father, who are both deceased. *Id.* She also expressed suicidal and homicidal ideation, but she retained fair insight and good judgment. *Id.* Despite having an impaired memory as to recent events, Plaintiff was alert and oriented during the assessment. *Id.* Ms. Dillon diagnosed her with major depression and assessed her with a Global

Assessment of Functioning ("GAF") score of 50.  Tr. 346.  Ms. Dillon also recommended some medication changes for Plaintiff and directed her to return in three weeks.  *Id.*

Three days later, on May 27, 2011, Plaintiff returned to the Bond Clinic for lab results and to complete the "updated pain management contract for the Lortab she receives monthly for her chronic back pain."  Tr. 349.  Plaintiff was seen by Ms. Welch, who noted that Plaintiff was present "with a little girl that she baby sits."  *Id.*

On June 14, 2010, Plaintiff had a second visit with Ms. Dillon and said she felt about the same with the medication changes.  Tr. 338.  She said she still had psychotic episodes, paranoid delusions, and both auditory and visual hallucinations.  *Id.*  She said the Ambien helped her sleep.  *Id.*  Ms. Dillon noted that Plaintiff's mood was still depressed, anxious, and tired, but she was not irritable on that day.  *Id.*  Plaintiff still had impaired recent memory and suicidal and homicidal ideation.  *Id.*  However, Plaintiff was alert and oriented, and had good insight and judgment.  *Id.*

On that same day, an MRI of Plaintiff's right knee showed a grade II-III chondromalacia[7] and Trace Baker's cyst posteriorly, medially.  Tr. 356; *see also* Tr. 368.  There was no evidence of a meniscal tear, and all other areas of the knee were "intact and unremarkable."  Tr. 356.

Plaintiff returned for a follow up visit with Ms. Welch on July 2, 2010.  Tr. 348.  Plaintiff said the "MRI was done on the wrong knee [and] should have been done on the

---

[7] Chondromalacia is the most common cause of chronic knee pain.  It is usually treated conservatively "with exercises designed to strengthen the muscles around the knee and restore normal alignment of the knee cap."  www.medicinenet.com

left knee[8] . . . ." *Id.* The notes indicate that the MRI "was done on the right because that is the one that gives her most of her pain." Tr. 348. Plaintiff reported "having persistent severe left shoulder pain, hip pain and lower back pain still present." *Id.* Ms. Welch noted, however, that Plaintiff was "able to walk without assistive device." *Id.* Ms. Welch also noted Plaintiff had "tenderness with limited range of motion" in her left shoulder and the "left knee has some catching sensation" but there was no current swelling or crepitance. Tr. 348. An arthritis profile was ordered and a referral to We Care for an MRI of the left knee and left shoulder. *Id.*

Plaintiff returned ten days later, on July 12, 2010, for a follow up with Ms. Dillon. Tr. 339. The notes reflect Plaintiff was "still paranoid" and agitated, but reported rarely hearing voices. *Id.* At Plaintiff's follow up appointment with Ms. Dillon on September 10, 2010, Plaintiff told Ms. Dillon that the "voices almost went away [with] Seroquel" and reported that Seroquel, along with Ambien, allowed her to sleep well. Tr. 341. Ms. Dillon noted that Plaintiff was casual, cooperative, demonstrated normal motor movements, had fair eye contact, and regular speech. *Id.* Although her mood was anxious and Plaintiff was tearful, Ms. Dillon no longer indicated Plaintiff was depressed or irritable. *Id.* She maintained a linear, logical, and goal-directed thought process and was alert and oriented. *Id.* Plaintiff still expressed hearing auditory hallucinations, but was not paranoid. *Id.* Plaintiff had both suicidal and homicidal ideation, and demonstrated fair insight, but with good judgment. *Id.* Ms. Dillon also noted that Plaintiff's memory was no longer impaired, but intact. *Id.*

---

[8] At Plaintiff's April 27, 2010, follow up appointment, Plaintiff complained of pain in her right knee. Tr. 354. Plaintiff was diagnosed with right knee crepitus. Tr. 354.

On that same day, September 10, 2010, Ms. Dillon completed a "Mental Residual Functional Capacity Questionnaire." Tr. 336. Of particular relevance to Plaintiff's argument, Ms. Dillon opined that Plaintiff would likely be "absent from work as a result of [her] condition, or treatment for same" seven or more days per month. *Id.* Ms. Dillon also assessed that Plaintiff could understand and carry out short simple instructions, but would require seven or more unscheduled breaks or absences during an eight hour workday. *Id.* In an explanatory comment, Ms. Dillon noted that she was not sure that "this would be adequate [as Plaintiff] has auditory hallucinations, is easily distracted, [and] is very emotional [at] times." *Id.*

The following month, on October 11, 2010, Ms. Welch also completed a "Physical Residual Functional Capacity Questionnaire." Tr. 335. She stated that Plaintiff could perform less than a sedentary range of work, exerting less than ten pounds occasionally, that she could only stand or walk between zero to one hour in an eight hour day, and could only sit for between zero to one hour in an eight hour day. *Id.* Ms. Welch also opined that Plaintiff would be absent from work three to four days per month and would require three to four breaks during an eight hour workday. *Id.*

Plaintiff was also examined by Temple O. Robinson, M.D., at the Bond Clinic that same day. Tr. 347. Dr. Robinson noted that Plaintiff was present for a follow up of her chronic left shoulder pain and chronic back pain. *Id.* Dr. Robinson's notes indicate Plaintiff was "in a usual state of health." *Id.* Plaintiff had decreased range of motion in her left shoulder, tenderness at her AC joint, and her grip strength was "slightly

diminished secondary to pain in the shoulder." Tr. 347.[9]  Dr. Robinson and the staff at

the Bond Clinic "assisted [Plaintiff] with some disability forms."  *Id.*

Plaintiff returned to Ms. Dillon on October 20, 2010.  Tr. 340.  She continued to

be appear casual, cooperative, demonstrated normal motor movements, and regular

speech, but this time Plaintiff also had good eye contact.  *Id.*  Her affect was congruent

with her mood,[10] she was not tearful, and had a linear, logical, and goal-directed thought

process, and was alert and oriented.  *Id.*  Plaintiff continued to report auditory

hallucinations, impaired recent memory and suicidal and homicidal ideation, but

maintained fair insight and good judgment.  *Id.*

Plaintiff had another MRI, this time on her left shoulder, on November 2, 2010.

Tr. 366.  The findings revealed tendinopathy of the rotator cuff, a small tear of the

posterior superior fibrocartillaginous labrum, a small paralabral cyst, mild-to-moderate

osteoarthritis of the acromioclavicular joint, and downward sloping of the subacromion.

Tr. 366.

Plaintiff returned to the Clinic for a follow up with Ms. Dillon on November 17,

2010.  Tr. 342.  She appeared neatly groomed, cooperative, with normal motor activity,

good eye contact, and regular speech.  *Id.*  Her affect was full and congruent to her

---

[9] The notes also stated that Plaintiff needed medications refilled, assistance in
getting an MRI of the shoulder, and after examining her shoulder, Dr. Robinson stated
that the "[r]emainder of physical exam was deferred."  Tr. 347.

[10] While it is not clear, it appears that both boxes are checked on the form indicating
Plaintiff's mood was both euthymic and depressed.  Tr. 340.  However, that would be
contradictory because an euthymic mood is in the normal range, implying the absence
of either a depressed or elevated mood.  www.healthdictionary.info.

mood,[11] and Plaintiff maintained a linear, logical, and goal-directed thought process.  *Id.*

She also displayed appropriate thought content, and no box was checked for

hallucinations, although a notation for psychiatric history indicates Plaintiff "hears voices

very slightly."  *Id.*  Plaintiff remained alert and oriented, and reported impaired recent

memory, with fair insight and judgment.  *Id.*  Plaintiff also continued to report both

suicidal and homicidal ideation.  *Id.*

Dr. Temple Robinson also completed a "Physical Residual Functional Capacity

Questionnaire" for Plaintiff on December 4, 2010.  Tr. 364.  Dr. Robinson stated that

Plaintiff could perform the lifting requirements of sedentary work (up to 10 pounds

occasionally), and indicated Plaintiff could stand or walk for two to three hours per day

in an eight hour workday, and could sit for four to five hours in an eight hour day.  *Id.*

Nonetheless, Dr. Robinson felt that Plaintiff's alleged impairments would affect her

attention and concentration, and would cause Plaintiff to be absent from work five to six

days per month, and necessitate five to six breaks per workday.  *Id.*

## V.  Analysis of Plaintiff's Arguments

Plaintiff was required to submit a memorandum to support the complaint, setting

forth her legal contentions and citing to the record for factual contentions.  Doc. 13.

Plaintiff's memorandum, doc. 14, is one page, and does little to explain the basis for this

appeal.  The memorandum is also unsigned.  Despite the absence of Plaintiff's original

signature, the document has been considered.  To the degree Plaintiff points to

---

[11] Similarly, Ms. Dillon again appears to have checked boxes for a depressed mood and euthymic mood, although Ms. Dillon may also have drawn an up arrow through the box for euthymic, indicating that mood was increasing.  Tr. 342.

evidence in the record, it has been reviewed, and her arguments concerning two specific challenges to the Commissioner's decision are addressed below. However, Plaintiff provides no support for a third conclusory argument raised in the complaint, doc. 5, that the ALJ was prejudiced against Plaintiff or low cost healthcare, and that argument is rejected.

### 1. Whether the hypothetical question included all of Plaintiff's limitations

Plaintiff's first argument focuses on step five of the Commissioner's analysis: whether Plaintiff is able to perform other work in light of her limitations. The ALJ determined that Plaintiff could do so based upon testimony from the Vocational Expert. However, Plaintiff asserts that the ALJ failed to consider the Vocational Expert's testimony that a person with her limitations, who would be absent from work at least five times per month, could not maintain employment. Doc. 5 at 1.

During the hearing, the ALJ posed a hypothetical question to the Vocational Expert to determine whether any jobs existed that Plaintiff could perform with her limitations[12] as shown in the medical records. Tr. 71-72. The question included the following limitations:

> [T]he person can perform a full range of sedentary work as defined in the regulations, but is limited to simple, routine, repetitive tasks; no production rate or pace work. Also, the hypothetical person should have no interaction with the public. While she can work around coworkers throughout the day, she should have only occasional interaction with coworkers, with no tandem tasks, meaning not performing any projects or working -- having to work together with a coworker on the same task. And I also want to give a sit/stand option . . . [t]he person can sit and stand at will.

---

[12] Because Plaintiff could perform "a full range of sedentary work only," all of Plaintiff's past relevant work would be excluded. Tr. 71.

Tr. 71.  The Vocational Expert identified jobs such as a "tube operator," which is a sedentary, unskilled job; a "charge account clerk," which is also a sedentary, unskilled job; a "call out operator," a sedentary, unskilled job; and an order clerk, food and beverage, sedentary, unskilled job.  Tr. 22-23, 72-75.

Plaintiff's attorney then asked the Vocational Expert to assume, in addition to the hypothetical posed by the ALJ, that the claimant would acquire five to seven absences per month.  Tr. 76-77.  The Vocational Expert advised that exceeding two absences a month would prevent employment, and the ALJ agreed with that statement saying, "That's right."  Tr. 77.  The ALJ concluded, however, that the hypothetical posed by Plaintiff's attorney was "not supported by the objective medical evidence of record in this case" and gave "no weight" to the Vocational Expert's response.  Tr. 23.

The basis for the number of absences per month comes from the opinions of Dr. Robinson, Ms. Welch, and Ms. Dillon.  Tr. 20-21.  The evidence reveals that Plaintiff was treated by Dr. Robinson just once, on October 11, 2010, but by Ms. Welch on five occasions, and by Ms. Dillon on six occasions which were nearly monthly between May and November of 2010.[13]

The ALJ noted Dr. Robinson's conclusion that Plaintiff "was likely to be absent from work five to six days per month and would need to take five to six unscheduled breaks or absences during an eight-hour workday."  Tr. 20, *citing* Exhibit 11F (Tr. 364). The ALJ gave "some weight to the opinion of Dr. Robinson" but noted that Plaintiff

---

[13] To summarize the evidence, Plaintiff was treated by Ms. Welch during 2010 on January 11th, April 27th, May 27th, July 2nd, and October 11th.  Tr. 349-350, 353-54, 335.  Plaintiff was treated by Ms. Dillon during 2010 on May 24th, June 14th, July 12th, September 10th, October 20th, and November 17th.  Tr. 343-46, 338-342.

testified that she saw Dr. Robinson only once.  Tr. 20.  Thus, Dr. Robinson is "not considered to be a treating physician whose opinion is entitled to substantial or controlling weight."  *Id.*  The ALJ concluded that "[t]he medical evidence of record, including the minimal findings from Dr. Robinson's single examination in October 2010, does not support this speculation regarding the claimant's ability to maintain work without excessive absenteeism and the need for breaks."  *Id.*  It was also noted that Dr. Robinson provided his opinion "on a pre-printed form" and did not explain or identify any support for that opinion.  *Id.*

The ALJ properly gave less weight to the opinion of Dr. Robinson because he was a "nontreating" medical source,[14] meaning that Dr. Robinson examined Plaintiff "but does not have, or did not have, an ongoing treatment relationship with" Plaintiff.  20 C.F.R. § 404.1502; § 416.902.  The Social Security Administration gives "more weight to opinions from [ ] treating sources, since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of [a claimaint's] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations."  20 C.F.R. § 416.927(c)(2); 404.1527(e)(2).  In addition, the "more a medical source presents relevant evidence to support an opinion, particularly medical signs and laboratory findings, the more weight" is given to that opinion.  *Id.*  "The better an

---

[14] To constitute a treating source, the physician must have provided Plaintiff with treatment or evaluation "and who has, or has had, an ongoing treatment relationship with" Plaintiff.  20 C.F.R. § 404.1502; § 416.902.

explanation a source provides for an opinion, the more weight" is given that opinion as well. *Id.* Dr. Robinson provided no explanation for the determination that Plaintiff would be absent five to six days per month and need five to six breaks during the workday. The opinion by Dr. Robinson is unsupported by any medical evidence. Furthermore, it is noted that the one examination of Plaintiff by Dr. Robinson appears to have been limited to the left shoulder as the notes stated: "Remainder of physical exam was deferred." Tr. 347. The ALJ committed no error in discounting this opinion.

The second medical opinion concerning the number of absences from work was provided by Ms. Welch, a nurse practitioner at the Bond Clinic. Tr. 20. Ms. Welch completed the questionnaire on October 11, 2010, two months prior to Dr. Robinson's completion of the questionnaire, stating that Plaintiff would be absent from work three to four times a month on average and would require three to four unscheduled breaks or absences during an eight-hour workday. *Id.*, *citing* Ex. 9F (Tr. 335). The ALJ provided three reasons to give "little weight" to Ms. Welch's opinion:

> The medical evidence of record, including the minimal findings from the few occasions that Ms. Welch examined the claimant between January and July 2010, do not support her conclusions regarding the claimant's extreme exertional limitations, excessive absenteeism, and the need for breaks. In addition, Ms. Welch's assessment was recorded on a non-standard preprinted form ostensibly provided by the claimant's attorney representative, as opposed to opinions fully articulated in her own words and recorded in the claimant's medical treatment notes with the Bond Community Health Center. Another factor considered is her status as a physician's assistant as opposed to a medical doctor.

Tr. 20.

The regulations limit which medical sources may "provide evidence to establish" a "medically determinable impairment(s)" to licensed physicians, psychologists,

optometrists, podiatrists, and qualified speech-language pathologists. 20 C.F.R.

§ 404.1513(a); § 416.913(a). Although nurse practitioners are not "acceptable medical

sources" for *establishing* an impairment, 20 C.F.R. §§ 404.1513(a), 416.913(a), they are

still considered "other medical sources" whose testimony may be used "to show the

severity of [a claimant's] impairment(s) and how it affects [the] ability to work." 20

C.F.R. § 404.1513(d)(1); § 416.913(d)(1). Osterhoudt v. Astrue, Case No. 8:10cv336-T-

TGW, 2011 U.S Dist. LEXIS 5781, at *7 (M.D. Fla. Jan. 14, 2011) (nurse practitioner).

Nurse practitioners are important sources of medical treatment and their opinions may

not be disregarded simply because they are not medical doctors. Butler v. Astrue, No.

CA 11-00295, 2012 WL 1094448, *3 (S.D. Ala. Mar. 30, 2012), *citing* Madise v. Astrue,

No. 08–00376–B, 2009 WL 3078294, at *11 (S.D. Ala. Sept. 23, 2009); Sommer v.

Astrue, No. 3:10–CV–99, 2010 WL 5883653, at *3 (E.D. Tenn. Dec. 17, 2010).

    In this case, the ALJ did not give "little weight" to Welch's opinion solely because

she was not a doctor, although that was the last stated reason. The ALJ gave other

reasons for doing so, all of which are sufficient. The ALJ noted there were "minimal

findings" from only a few examinations[15] by Ms. Welch, found that her opinion was not

supported by the objective medical evidence, and that the opinion was provided "on a

non-standard pre-printed form ostensibly provided by the claimant's attorney

representative, as opposed to opinions fully articulated in her own words and recorded

---

[15] Length of a "treatment relationship and the frequency of examination" along with
the extent of a treatment relationship are proper considerations. 20 C.F.R.
§ 404.1527(c)(2)(i), (ii); § 416.927(c)(2)(i), (ii). "Generally, the longer a treating source
has treated you and the more times you have been seen by a treating source, the more
weight we will give to the source's medical opinion." 20 C.F.R. § 404.1527(c)(2)(i);
§ 416.927(c)(2)(i).

in the claimant's medical treatment notes with the Bond Community Health Center."

Tr. 20.  While Ms. Welch had a ten month treatment history with Plaintiff, there is no

evidence in the treatment notes which explain any basis for finding that Plaintiff would

have chronic or excessive absenteeism from work.  The records do not provide any

indication that Plaintiff was unable to keep her scheduled appointments, that she

needed to re-schedule appointments due to any impairment or limitation, or that

Plaintiff's pain was so debilitating that she would be unable to go to work.  Plaintiff had

only mild restrictions in daily living, needing reminders because of some memory

impairments, but there was no evidence that Plaintiff suffered any episodes of mental

decompensation that would hinder work attendance.  Because the ALJ reasonably

concluded that Ms. Welch's opinion was not supported by evidence in the record, no

error has been shown in giving it little weight.

The third medical opinion concerning the number of absences from work was

from Ms. Dillon who opined on September 20, 2010, that Plaintiff would be absent from

work "seven or more times a month on average, and would require seven or more

unscheduled breaks or absences during an eight-hour workday."  Tr. 21, *citing* Ex. 9F

(Tr. 336).  The ALJ provided essentially the same reasons for giving "little weight" to the

opinion of Ms. Dillon, also an advanced registered nurse practitioner, as was given for

discounting the opinion of Ms. Welch.  Tr. 21.

> The medical evidence of record, including the minimal findings from the few
> occasions that Ms. Dillon examined the claimant between May and November
> 2010, do not support her conclusions regarding the claimant's mental limitations,
> excessive absenteeism, and the need for breaks.  Furthermore, Ms. Dillon's
> assessment was recorded on a non-standard preprinted form, containing only
> conclusions without the bases for her concludsions [sic].  Another factor that was

considered was her status as an advanced registered nurse practitioner as opposed to an acceptable medical source.

Tr. 21.  The form did not contain narrative descriptions or objective medical findings to support the opinion.  *See* Osterhoudt v. Astrue, Case No. 8:10cv336-T-TGW, 2011 U.S Dist. LEXIS 5781, at *7; 20 C.F.R. § 404.1513(d)(1), § 416.913.(d)(1); *see also* Teague v. Astrue, 638 F.3d 611, 615 (8th Cir. 2011) ("Given that the 'check-off form' did not cite any clinical test results or findings and Dr. Lowder's previous treatment notes did not report any significant limitations due to back pain, the ALJ found that the MMS was entitled to 'little evidentiary weight.'").  As was the case with Ms. Welch, the ALJ noted there were "minimal findings" from only a few examinations by Ms. Dillon and also found that her opinion was not supported by the objective medical evidence.

Although Ms. Dillon is a nurse practitioner and not an "acceptable medical source," her testimony, like that of Ms. Welch, may still be relevant to the issue of the severity of Plaintiff's impairments and their impact Plaintiff's ability to work.  20 C.F.R. § 404.1513(d)(1); § 416.913.(d)(1).  To be relevant, however, there must be some medical evidence to support the opinion.  Here, the ALJ discounted the opinions of both Ms. Dillon and Ms. Welch, and articulated the reasons for doing so.  Neither opinion was bolstered by the medical evidence and neither opinion provided any explanatory statement.  The medical evidence contained in the treatment notes of Ms. Dillon and Ms. Welch provide no basis for finding that Plaintiff would be absent from work an excessive number of days.  Thus, the hypothetical question included all of Plaintiff's limitations and this argument is reject.

### 2. Whether the opinions of Plaintiff's treating physicians were given sufficient weight

In her complaint, Plaintiff identifies several medical providers who provided her treatment and contends the ALJ did not given their opinions sufficient weight.  Doc. 5.  The providers identified were: Dr. Lawrence V. Annis, Ph.D; Donna Dillon, ARNP; Tiffany Welch, PAC; Dr. Temple Robinson, and Dr. Edwardo Williams.  Doc. 5.  Plaintiff's memorandum, however, does not clearly explain her argument or specifically state which medical provider she believes was not given sufficient weight.  Doc. 14.  Rather, Plaintiff broadly argues that the medical providers gave expert opinions and it was error for the ALJ to discount those opinions.  *Id.*  The only medical providers mentioned in the memorandum which were also cited in the complaint were Dr. Lawrence Annis and Dr. Edwardo Williams.  The memorandum fails to mention Ms. Dillon, Ms. Welch, or Dr. Robinson; instead, Plaintiff cites to the records and notes of Carla Holloman, James Mendelson, and Richard Lyon.  Doc. 14.  None of those persons were treating physicians.[16]  The opinions of treating physicians are usually given more weight than non-treating physicians, and the opinions of examining physicians are given more weight than non-examining physicians.  20 C.F.R. § 404.1527(d)(1)–(2), § 416.927(d)(1)–(2).

---

[16] Plaintiff was seen by Carla M. Holloman, D.O., for a consultative examination on February 24, 2008.  Tr. 269-74.  Plaintiff was examined on March 24, 2009, by James Mendelson, Ph.D., a state agency psychologist, who completed a PRT.  Tr. 286-299.  Plaintiff was seen by Richard K. Lyon, Ph.D., another state agency psychologist who completed a PRT on November 23, 2009.  Tr. 320-33.  Dr. Lyon and Dr. Mendelson concluded that Plaintiff did not have a severe impairment.  Tr. 320, 330.

Dr. Annis examined Plaintiff on February 19, 2009, at a consultative examination and concluded that Plaintiff's depression and anxiety would impede her occupational achievement and "she would require more encouragement than most people when encountering work difficulties or social challenges." Tr. 285. Plaintiff would also perform poorly in occupations that required frequent, protracted, or demanding social interaction. Tr. 285. Dr. Annis also believed that Plaintiff should "avoid employment at occupations requiring driving or contact with dangerous substances." Tr. 285.

Dr. Mendelson did not find that Plaintiff had severe impairments, Tr. 286, and concluded that Plaintiff's functional limitations were mild. Tr. 296. Similarly, Dr. Lyon found Plaintiff's impairments were "not severe," doc. 320, and her functional limitations were mild. Tr. 330. The ALJ stated that little weight was given to those opinions. Tr. 21. To the degree the opinions found Plaintiff "did not have a severe medically determinable mental impairment," it was contrary to the ALJ's findings and does not benefit Plaintiff. The ALJ explained that the record evidence showed Plaintiff's "physical and mental impairments have more than a minimal effect on the [Plaintiff's] ability to perform work-related activities." *Id.* Dr. Annis, on the other hand, examined Plaintiff only once, he "appeared to rely solely on the [Plaintiff's] self-reported history and symptoms, which Dr. Annis admitted were vague and inconsistent." *Id.* Additionally, the ALJ discounted the opinion of Dr. Annis because medical evidence from the Bond Community Health Center indicated that Plaintiff's symptoms were "controlled or lessened with the use of medication." *Id.*

Therefore, the ALJ evaluated each of the consulting and examining opinions and explained the weight given to each opinion. Because the opinions were not supported by the medical evidence and were inconsistent with the records of Plaintiff's treating medical providers, they were properly limited.

**Conclusion**

Considering the record as a whole, the findings of the Administrative Law Judge were based upon substantial evidence in the record and she correctly followed the law. The decision of the Commissioner to deny Plaintiff's applications for benefits should be affirmed.

Accordingly, it is **RECOMMENDED** that Carolyn Colvin be automatically **SUBSTITUTED** as Defendant pursuant to Fed. R. Civ. P. 25(d), and the decision of the Commissioner to deny Plaintiff's applications for Social Security benefits be **AFFIRMED**.

**IN CHAMBERS** at Tallahassee, Florida, on November 12, 2013.


 S/     Charles A. Stampelos
**CHARLES A. STAMPELOS**
**UNITED STATES MAGISTRATE JUDGE**


**NOTICE TO THE PARTIES**

**A party may file specific, written objections to the proposed findings and recommendations within 14 days after being served with a copy of this report and recommendation. A party may respond to another party's objections within 14 days after being served with a copy thereof. Failure to file specific objections limits the scope of review of proposed factual findings and recommendations.**